**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

SANDRA HALL, SPECIAL ADMINISTRATOR   )
OF THE ESTATE OF CHELSEA WEEKLEY,   )
Deceased,   )
   )
          Plaintiff,   )
   )
v.   )  Cause No. 3:13-cv-00914-SMY-DGW
   )
ANN MARIE FLANNERY, M.D.,   )
RAGHURAM SAMPATH, M.D., and   )
SSM CARDINAL GLENNON CHILDREN'S   )
HOSPITAL,   )
          Defendants.   )

**PLAINTIFF'S MOTION FOR THE IMPOSITION OF SANCTIONS, INCLUDING
ENTRY OF DEFAULT JUDGMENT AND/OR THE BARRING OF EVIDENCE
AGAINST DEFENDANTS, SSM CARDINAL GLENNON CHILDREN'S HOSPITAL,
ANN MARIE FLANNERY, M.D. AND RAGHURAM SAMPATH, M.D., FOR
SPOLIATION OF EVIDENCE**

Now comes the Plaintiff, Sandra Hall, Special Administrator of the Estate of Chelsea

Weekley, Deceased, by and through her attorneys, The Law Office of Rhonda D. Fiss, P.C., and

Rhonda D. Fiss, and for Plaintiff's Motion for the Imposition of Sanctions for Spoliation of

Evidence Against Defendants, SSM Cardinal Glennon Children's Hospital (hereinafter SSM

CG), Ann Marie Flannery, M.D., and Raghuram Sampath, respectfully alleges the following:

1.     Chelsea Weekley (hereafter "Chelsea") died of a seizure on July 24, 2011, within four

        days after she underwent neurosurgery performed by Defendant Drs. Flannery and

        Sampath at SSM Cardinal Glennon Hospital.  Defendant Flannery was informed of

        Chelsea's death on July 24, 2011, and on July 25, 2011, SSM CG commenced an internal

        investigation that involved several unidentified SSM/Cardinal Glennon staff members

and risk management personnel.  **(Ex. 1)**.

2. Plaintiff filed her initial Complaint against the Defendants on July 19, 2013, (**Doc. 2-2**) and has since determined that her deceased child's medical records pertaining to Chelsea's treatment at Cardinal Glennon have been improperly deleted, edited, revised, and concealed, commencing on July 25, 2011, within 24 hours after her death, to present.  Based upon the timing and nature of the improper alterations, deleted and concealed documents and information in Chelsea's medical record, Plaintiff is compelled to conclude that Defendants, Cardinal Glennon, through its agents and representatives, began to "sweep" her medical records as of July 25, 2011, and continued to pervasively change and eliminate portions of the records for the purpose of destroying evidence unfavorable to Defendants, as further set forth herein.

3. On July 25, 2011, after SSM CG had been informed of Chelsea's death and staff was preparing its Event Occurrence Executive Summary, the following activities took place in Chelsea's medical chart:

At 7:11 a.m., a nurse practitioner files Chelsea's Discharge Summary that had been prepared on July 22, 2011; Dr. Flannery does not co-sign the Discharge Summary until August 1, 2011.  The Discharge Summary reflects that Chelsea was admitted for a "cranioplasty" only;

At 10:16 a.m. a completed lab result with an order identified as ending in #583 was edited and ultimately deleted later that day;

At 10:16 a.m. a procedure notes authored by an unidentified "physician" were entered related to the deleted lab result.   These notes appear directly below Dr. Flannery's Operative Report for Chelsea's surgery on July 21, 2011:

At 10:16 a.m. a physician, under transaction ID ending in #889, entered an undisclosed "Note" authored by "Scanned Document" referencing Discharge instructions that had previously been scanned into Chelsea's record on July 22, 2011

4.    On March 2, 2012, SSM CG, in response to a release and request for records, printed what it certified on March 8, 2012 to be the entire medical record for Chelsea's treatment at SSM CG.  These records were labeled by Plaintiff as **Hall Bates #00001-150**. **(Ex. 2)**

5.    On August 20, 2013, after this litigation commenced, SSM CG printed a set of medical records that it produced to Plaintiff with its Rule 26(a)(1)(A)(ii) disclosure, labeled **Cardinal Glennon (CG) Bates #0001-151**. **(Ex. 3)**

On December 2, 2013, Plaintiff received Defendant SSM CG's Response to her Request for Production:

1.    Each and every record of and or pertaining to your medical treatment of Chelsea Weekley, including, but not limited to, office notes, hospital charts, nurse's notes, diagnostic test reports, surgical/operative notes/reports, chart notations, discharge summaries and instructions.

      **RESPONSE**:  **See medical records of Chelsea Weekley, previously produced at Cardinal Glennon 0001-151**.

6.    In follow-up correspondence and discovery responses from Defendants' lawyers, SSM CG has consistently represented to Plaintiff that "we have produced the complete medical record.  There are no other responsive documents."   **(Ex. 4)** (2.11.14 letter from Taylor) "Further, Cardinal Glennon states that no information was deleted from Chelsea Weekley's medical record."  **(Ex. 5)** (Resp #1 to Plaintiff's Second Supplemental Req for

Prod) **In fact, and as detailed specifically below, the two sets of records produced by Cardinal Glennon in 2012 and 2013 differ vastly and cannot be reconciled.**

7.      The impact of the altered, deleted, and concealed information from Chelsea's record becomes clear when considered in conjunction with Plaintiff's allegations of malpractice, which are predicated on independent expert opinions that she died of a seizure. Plaintiff's ability to prevail in this case depends upon her ability to present sufficient evidence that Defendants knew or should have known that Chelsea suffered trauma to her brain that made her susceptible to seizure, but failed to provide appropriate post-surgical care, that would have included appropriate tests and anti-seizure medication to address and prevent the seizure that caused her death.  During this litigation, experts on both sides of the fence agree to the following:

     a.      A history of trauma to the brain, and the scar tissue on the brain that may result, predisposes a person to seizures; **(Ex. 6)**

     b.      Brain surgery is controlled trauma to the brain **(Ex. 7)**

     c.      Breach of the brain cortex can occur by manipulation of brain tissue as well as by instrument **(Ex. 8)**

     d.      Injury to the brain cortex during surgery or otherwise requires the prescription of prophylactic anti-seizure medicine.  **(Ex. 9)**

8.      Drs. Flannery, Sampath and their controlled experts have acknowledged that, had the cortex of Chelsea's brain been damaged, prophylactic anti-seizure medication should have been administered to her post surgery. **(Ex. 9)** and **(Ex. 10**-Article by Dr. Flannery) However, in their defense of Plaintiff's allegations that Defendants Flannery and Sampath

should have tested for seizure activity or prescribed medication to address possible

seizure after Chelsea's surgery, Defendants have vigorously disputed that Chelsea

suffered trauma to her brain other than her initial skull fracture that occurred at five

months of age and the expansion of a contusion into the lower levels of her brain.

Defendants posit that because the old injury was present for years without indication of

seizure, there was no reason to anticipate seizure after the surgery was performed.

9.      Further, although they have no qualified expert's opinion as to a cause of death for

Chelsea other than seizure, Defendants have consistently disputed that Chelsea died as a

result of a seizure, and more specifically, dispute that she had any symptoms, trauma to

her brain, or condition within her brain at the time of surgery or after surgery that

required them to anticipate a seizure after the surgery.

10.     To lend credence to their position that a seizure was not foreseeable for the reasons set

forth above, Defendants have either altered Chelsea's records to eliminate the word

"craniotomy" or intentionally omitted within her records the fact that a craniotomy was

performed,  in addition to the cranioplasty.  **(Ex. 11)** A craniotomy is a surgical procedure

below the skull that involves opening the dura, which is more likely to generate post-

surgical seizure activity,  rather than a cranioplasty, which is a surgical procedure to

correct defects on the skull itself.

11.     In conjunction with concealing the type of surgery performed on Chelsea, and as more

specifically set forth below, when Defendant SSM CG purportedly produced Chelsea's

entire chart, it withheld a portion of her emergency room documentation, and then

provided to Plaintiff an altered version of Chelsea's emergency room records for the visit

that prompted scheduling of the surgery. This ER visit occurred on June 3, 2011, by referral from a neurologist in Illinois, because Chelsea had been elbowed in the head during a basketball game in April and was still experiencing problems. These documents pertaining to the ER visit were withheld and altered for the purpose of obscuring the additional trauma to Chelsea's brain within four months leading up to surgery and which made the surgery necessary, as per Dr. Flannery. **(Ex. 2, Hall Bates #'s 00036, 00042 & 00043)**

12.    At the time of Chelsea's surgery in July, 2011, there were statutes in effect in Missouri, where the surgery occurred, for the purpose of protecting the patient by ensuring the integrity of patient medical records. In pertinent part, these statutes state as follows: Code of State Regulations–State of Missouri: Division 30-Division of Regulation and Licensure, Chapter 20–Hospitals

**19 CSR 30-20.011** Definitions Relation to Hospitals (as of 7/31/07)

"(5)    Authenticate–To prove authorship, for example, by written signature, identifiable initials or computer key. . . ."

19 CSR 30-20.094 Medical Records

"(2)    ***All*** patient care documentation shall be entered in the patient's medical record promptly. Such documentation shall be legible, dated, timed, ***authenticated***, and recorded." (Emphasis Added)

"(8)    Patient records shall be considered complete when the required contents are assembled and ***authenticated***." (Emphasis Added)

"(9)    ***All*** medical records shall include, as appropriate:

6

(G)     All practitioners' orders, nursing notes, reports of treatment, medication records, ***radiology***, ***laboratory reports***, vital signs, and other information necessary to monitor the patient's condition.

(I)     Final diagnosis with completion of medical records within thirty (30) days following discharge." (Emphasis Added)

"(14)    The patient's medical records shall be maintained to safeguard against loss, defacement, ***unauthorized access, and tampering*** ...... ." (Emphasis Added)

**Missouri Revised Statutes, Chapt. 334, Section 332.097**. . .

"2.     Patient records remaining under the care, custody and control of the licensee shall be maintained by the licensee of the board, or the licensee's designee, for a minimum of seven years from the date of when the last professional service was provided."

"3.     **Any correction, addition or change in any patient record made more than forty-eight hours after the final entry is entered in the record and signed by the physician <u>shall be clearly marked and identified as such, and the date, time and name of the person making the correction, addition, or change shall be included, as well as the reason for the correction, addition or change.</u>"**

(Emphasis Added)

13.    In addition to Missouri's laws and regulations set forth above, the Medical Staff Rules and Regulations for Cardinal Glennon Hospital in effect in 2011contained the following mandates with regard to the preparation and maintenance of its patients' records:

**"B.    Medical Records**

1.    The attending physician shall be responsible for the preparation of a **complete and legible** medical record for each patient. . . This record shall include. . .clinical laboratory and radiology services. . .pathological findings. . ..  (Emphasis added)

5.    Wherever possible, each of the patient's clinical problems should be clearly identified in the progress notes and correlated with specific orders, as well as *results of tests* and treatment.  (Emphasis added)

6.    Operative reports shall be dictated immediately following an operation, and must include, at a minimum, . . . .technical procedures used, specimens removed. . . should be promptly signed by the surgeon and made a part of the patient's current medical record.

16.   The responsible physician. . .is required to complete the patient's medical record in a timely fashion following discharge, including progress notes, final diagnosis, and dictated clinical resume.

**D.    General Rules Regarding Surgical Care**

7.    All tissues removed at the operation shall be sent to the hospital pathologist who shall make such examination as he/she may consider necessary to arrive at a tissue diagnosis.  His/her *authenticated report* shall be made a part of the patient's medical record." (Emphasis Added)

14.   As specifically detailed below, Defendants SSM CG and Flannery, as the physician responsible for Chelsea's records, have committed numerous and pervasive acts in the recording and handling of her chart that are in direct violation of the laws of the State of Missouri and their own Rules and Regulations.  As a result,  the integrity of the medical

records available after Chelsea's death after July 24, 2011 and throughout this litigation has been destroyed. These many and varying violative acts were choreographed and committed for the purpose of concealing, removing and/or changing information from the record that might lend credence to Plaintiff's allegations of malpractice, and have resulted in a medical chart that is wholly unreliable.

15. The deleted lab result and the flurry of unauthenticated activity in the medical chart that surrounds the deletion on July 25, 2011 must be considered in light of other events that occurred during Chelsea's stay at SSM CG. The operative report for Weekley's surgery, filed by Dr. Flannery on July 21, 2011, states that "We were able to resect enough soft tissue so that the herniated edges were able to be returned to the intracranial space." **(Ex. 3, CG Bates #00029**), and in the depositions of both Defendant physicians, they admit that they resected (cut out) tissue from Chelsea's brain during the surgery, but purportedly did not send any of the tissue removed to pathology. **(Ex. 3, CG Bates #00028)**

16. Defendant Flannery also testified in her deposition that the area of Chelsea's brain where she was operating was "distorted" and that she was working in the sub-arachnoid space, which is directly above the gray matter, or cortex, of the brain. ( **Ex. (12)** However, Dr. Flannery patently denies surgically breaching the cortex of the brain. **(Ex. 13)**

17. Had a pathological analysis of tissue removed from Chelsea's brain during the surgery revealed presence of gray or white matter (cortex), the medical experts and the Defendant Sampath all agree that prophylactic anti-seizure medication should have been prescribed for Chelsea. A reference to the deleted Lab Results Order appears directly below an entry in the chart on July 25, 2011 where a "physician" changes the Discharge Summary.

18. Defendants filed their experts' disclosures for this case on May 30, 2014, wherein their neuro-pathology expert, Douglas Miller, offered an alternate opinion as to cause of death other than seizure, prompting counsel for Plaintiff's to re-examine Chelsea's medical records, in particular any test results, that could either support or dispute the alternative opinion–that Chelsea had died from a heart condition rather than seizure. It was at this time that Plaintiff's counsel focused on what appeared to be an unauthenticated "deletion" from the medical record.

19. According to Cardinal Glennon's records, **(Ex. 3, CG Bates # 0045)** under the heading of Lab-Lab Results, a Lab Results Order ending in 583 was resulted on **July 22**, 2011 at 1431 (2:31 p.m.) as a final result. The Lab Result has an ID number of 16066872 as of July 22, 2011 at 11:07 a.m. and labeled the same day as a "final result" at 1431(2:31 p.m.). The result status is noted as "Final Result" and the Order Status is "Completed". **This entry is not authenticated by name or otherwise, as required by Missouri regulations**.

20. The same Lab Results Order ending in 583, is then resulted again at 10:16 a.m. on **July 25, 2011, the day after Chelsea's death**. The result status is changed from "final result" to **"edited"**. Again, this activity within the record **is not authenticated**. According to "Narrative" within this entry, "a scan was deleted from the Results section by S Interface {936105}{File #16066872}and was the same Lab Result that had been identified on July 22, 2011 at 11:07 a.m. and entered as a final result at 1431 (2:31) p.m. This same entry appears twice on **(Ex. 3, CG Bates # 45)** with the exception that in the second entry the "Narrative" section contains no information. This entry also is **not authenticated**.

21. On Cardinal Glennon **(Ex. 3, CG Bates # 35)** , under "All Orders", this same Lab Results Order ending in 583 lacks any authentication whatsoever, and identifies the Ordering

User as Scanning in Interface on 07/2011 at 0000, Authorized by "Scanned Document". This Order is noted as "Edited". According to this entry, the computer not only creates orders to delete information from medical charts, it created the initial orders to scan the documents into the chart, and then edits its own orders thereafter, then delete the results of its own volition, coincidentally, after the patient has been discharged and died, and for no apparent reason whatsoever.

22. Although Defendants have refused to answer Plaintiff's interrogatory posed to them regarding the "deleted" scan of July 25, 2011, SSM CG offered an explanation for the deletion of the lab result on August 15, 2014, that includes the following:

"No laboratory test result was deleted. . ."

"The entry in the records is an error message that appeared when the transfer of Sparta Community Hospital pre-operative lab results from the OnBase scanning software to the EPIC electronic health record system failed. It was sent again from OnBase to EPIC and was thereafter correctly hyperlinked in Chelsea Weekley's chart. The narrative referring to a 'deleted' scan is simply stating that the failed scan was 'deleted' from the error list in OnBase's scanning software. The 'results section' of the 'S Interface {936105} is **understood,** based on Cardinal Glennon's communications with EPIC, to be the list where failed scans in ONBase are identified. (Emphasis Added). The ID NO. 16066872 is **understood**, based upon Cardinal Glennon's communications with EPIC, to be the number the computer generated and assigned to the lab results document that did not scan correctly." (Emphasis Added)

23. Defendant has offered no further explanation nor produced any documentation to corroborate this nonsensical "explanation" that blames the actions of a calculating and self-commanding computer program for the deletion of lab result from Chelsea's chart

the day after her death and while several other unauthenticated changes were made to her various portions of her chart, all at the same time: 10:16 a.m.. In contrast and for comparison, the Lab Results for Chelsea's pre-op urinalysis that appears at the bottom of Cardinal Glennon (**Ex. 3, CG Bates # 0045**)-Point of Care Testing, are properly authenticated with the identification of Ann Marie Flannery as Ordering Provider.

24.    Since offering the above "explanation" as to the deleted lab results, and instead of simply providing an audit log that would show all of the activity within Chelsea's chart, Defendants have filed a motion for protective order that accuses Plaintiff of abusing the discovery process by seeking information pertaining to the deleted scan and integrity of Chelsea's medical chart, and are asking the Court to deny Plaintiff any further discovery in this case in a transparent attempt to divert the Court's attention from their mutilation of Chelsea's records after her death.

25.    Although in its "explanation" for the deletion Defendants claim that they were Sparta lab results thereafter correctly hyperlinked in Chelsea's chart, and in spite of the fact that Cardinal Glennon has represented to Plaintiff that it has produced all of Chelsea's medical records, no Sparta Lab results were contained in the certified chart produced by SSM CG in March of 2012 or in the Cardinal Glennon Bates numbered documents it produced to Plaintiff with its initial disclosures.  In fact, SSM CG did not produce the Sparta lab results supposedly contained within Chelsea's chart in July, 2011 until August 15, 2014, with the above explanation for a deleted lab result.

26.    What is known and relevant to the lab result deletion from Chelsea's chart are Flannery and Sampath's claims that they, in direct violation of Cardinal Glennon's Rules and Regulations, did not turn over tissue resected from Chelsea's brain to pathology for identification/examination, when such tissue may have contained brain cortex or other

material that would have refuted the defense that further diagnostic testing and/or prophylactic antiseizure medication was not indicated for Chelsea.

27.    In conjunction with the deleted information from Chelsea's chart, the destruction of the brain tissue resected during Chelsea's surgery becomes even more significant because SSM CG and Flannery have actively concealed within Chelsea's medical records and in discovery conducted in this case that Flannery and Sampath performed a craniotomy on Weekley on July 20, 2011,  in addition to a cranioplasty.  **(Ex. 3, CG Bates #'s 0027, 0031, 0033, 0034, 0126 & 0136)**   However, Chelsea's mother, Sandra Hall, was billed for both a craniotomy and a cranioplasty.  **(Ex. 11)**  Exclusion of any mention of the craniotomy within Chelsea's chart indicates, then, that either craniotomy shouldn't have been billed or someone intentionally kept reference to it out of the chart.  In light of those alternatives, the omission or perhaps subsequent deletion of this surgical procedure from Chelsea's chart is an outrageous violation of the laws and regulations for maintenance of an accurate record of hospital care. In every description of the surgical procedure contained within Chelsea's chart, the word craniotomy is omitted for the purpose of denying that portions of Chelsea's surgery took place at a level near the cortex of the brain, thereby enhancing the likelihood of post-op seizures.  It is therefore reasonable to assume that some type of laboratory testing, be it of tissue, blood, or otherwise, was resulted that CG feared would reflect adversely on the treatment rendered to Chelsea, and was therefore deleted from her chart after her death in contemplation that litigation may ensue.  Otherwise there was no reason for deletion of a lab result from Chelsea's chart after she had been discharged and subsequently died.

28.    If all of the above weren't sufficient to establish an intent on the part of SSM CG to clandestinely "adjust" Chelsea's medical chart for the purpose of avoiding liability for her

death, the following acts, in audacious and willful noncompliance with state law and Cardinal Glennon's rules, occurred within Chelsea's medical record:

a.  At 10:16 on July 25, 2011, at exactly the same time that the computer supposedly decided to delete a scanning error, a **"Physician"** authored an activity within the chart related to Lab Results Order #583 and Transaction ID #872 that had been scanned in at 11:07 a.m. on July 22, 2011 and filed by Scanning in Interface at **14:31** (2:31 p.m.) the same day.

b.  At the bottom of the Procedure Notes on **(Ex. 3, CG Bates #30)**, the record contains the following:

    **"07/22/11 1431 Lab Results signed by Scanning in Interface**

29.  In preparation for the deposition of Defendants' neurosurgical expert, Dr. John Ruge, counsel for Plaintiff had to use Chelsea Weekley's medical records certified by Cardinal Glennon on March 8, 2012, and labeled "Hall" because those records had initially been produced by Plaintiff and used during the deposition of Defendant Flannery. Once it became apparent that the page numbering and placement of information on these records differed vastly from those produced by Cardinal Glennon in this litigation, Plaintiff's counsel decided to compare the contents of the records, which took several hours over the course of multiple days.

30.  During comparison of the two sets of records, Plaintiff's counsel discovered that the **(Ex. 2, HALL Bates #00060)** of the Cardinal Glennon records certified by Cardinal Glennon on March 8, 2012, contains the same Procedure Notes that appear on **(Ex. 3, CG Bates #00030)**, produced to Plaintiff during this litigation on November 1, 2013, with a printing date of August 20, 2013. However, between March 8, 2012, when the Hall records were certified by Cardinal Glennon and August 20, 2013 when Cardinal Glennon printed the

purported complete copy of Chelsea's records it produced with its Rule 26 Disclosures, more unauthenticated tampering with Chelsea's chart occurred. As of August 20, 2013, after this litigation commenced, there is a glaring and material difference in the final entry for the 07/25/11 Procedure Notes pertaining to the lab results deleted from Chelsea's chart after her death:

Hall record certified by Cardinal Glennon on March 8, 2012 and labeled (**Ex. 2, HALL Bates #00060**) :

07/22/11 1431 Lab Results *Revision* by: Scanning in Interface (Emphasis Added)

Cardinal Glennon record produced to Plaintiff on November 1, 2013 as (**Ex. 3, CG Bates #00030**):

07/22/11 1431 Lab Results *signed* by Scanning in Interface (Emphasis Added)

31.  Clearly someone went back into Chelsea's medical record between March 8, 2012 and November 1, 2013, long after the record had become final and not subject to alteration of any type, and intentionally changed the word **"revision"** of the lab results order to **"signed"** in an attempt to conceal the unauthenticated revision of the record that had taken place on July 25, 2011, the day after Chelsea died.

32.  In addition, the comparison of the chart labeled "Hall" with the chart produced as "Cardinal Glennon" shows that by the time all of the improper alterations and deletions within Chelsea's chart were completed and produced in November, 2013, the information had been transferred to completely different pages within the chart, and although there is approximately the same number of pages, the "Cardinal Glennon" records contain large sections of blank page, believed to have resulted from deletion of information originally charted in Chelsea's records. Of particular note is that no treatment or monitoring whatsoever is noted in the chart between approximately 11:35 p.m. on July 20, 2011 until

3:45 a.m. on July 21, 2011 and then again on July 21, 2011 at approximately 10:45 p.m. until 2:00 p.m., which was immediately prior to her discharge, which is inconceivable for a post-brain surgery patient who, by Dr. Flannery's own admission, could have been seizing prior to discharge. These assumptions that significant portions of Chelsea's record is missing are further supported by the following:

33.     In addition to, and in conjunction with Defendants' efforts to eliminate all indications that Chelsea suffered trauma to the brain that pre-disposed her to seizures, Cardinal Glennon has never produced the emergency room record for Chelsea from June 3, 2011, that consists of two pages, labeled as **(Ex. 2, HALL Bates #00042 & 00043)** of the Cardinal Glennon records certified on March 8, 2012. Also, Cardinal Glennon has never disclosed the name of the nurse who did the initial physical for Chelsea on June 3, 2011, although it claims to have provided the names and addresses of all medical staff who treated Chelsea.

34.     However, Cardinal Glennon's refusal to produce the aforementioned initial emergency room information and documents pales in comparison to yet another unauthenticated deletion of information contained in Chelsea's medical chart directly related to trauma to Chelsea's brain prior to the surgery that undermines the defenses presented by Defendants in this case. Between the time Cardinal Glennon produced the "Hall" version of Chelsea's chart on March 8, 2012, and Cardinal Glennon's production of the chart in this litigation, the following has been inexplicably **deleted** from Chelsea's records:

**(Ex. 2, HALL Bates #00036)**

ED Chief Complaint

***Trauma***                          ***at 5 months was dropped skull fractured rad***
                                       ***without films not diagnosed until 2 months ago.***
                                       ***Elbowed in head and blacked out.***

(Emphasis Added)

**(Ex. 3, CG Bates #0002)**

ED Chief Complaint

***None***

35.    In addition to all of the above, Defendants have concealed by deletion or omission from Chelsea's record, the radiologist's report for an MRI with contrast done on Chelsea's brain a week prior to her surgery. Such reports are mandated by state law and SSM CG'S Rules and Regulations to be included in the record. Defendants have since used the MRI without contrast report in an unsuccessful attempt to discredit Plaintiff's independent expert as to cause of death, Mary Case, while knowingly reciting into the deposition record that the report referred to was for MRI "with and without" contrast. **(Ex. 14)**

36.    On July 14, 2011, Chelsea was administered gadopentetate dimaglumine by injection per Order by Dr. Flannery that an MRI of her brain be done with and without contrast. According to **(Ex. 3, CG Bates #00016)** of Chelsea's records, Flannery initially ordered the MRI without contrast, and then canceled that order and reissued the order for MRI with contrast, which was done on July 14, 2011 at 1337. **(Ex. 3, CG Bates #0017)** There is a page pertaining to the MRI order contained within the records produced as **(Ex. 2, HALL Bates #00038)** , which is predominantly a blank page; This page is missing completely from the records Cardinal Glennon **(Ex. 3)** has produced in this litigation.

37.    Within both the "Hall" and "Cardinal Glennon" versions of Chelsea's chart, an MRI Report exists for the MRI ***without contrast*** only. This report is incorporated into Chelsea's chart produced by Cardinal Glennon in this litigation as **(Ex. 3, CG Bates #0017).** Directly beneath this MRI Report on this page the following is shown:

**Lab Results**

**No results found**

38.  The medical records certified by Cardinal Glennon on March 8, 2012 and labeled as "Hall" contain the same MRI without contrast Report, but **do not contain the "Lab Results" notation. (Ex. 2, HALL Bates #00047)**

39.  Cardinal Glennon has never produced a report for the MRI with contrast and one is not contained within Chelsea's medical records produced during this litigation. Because Chelsea was injected with dye for the purpose of obtaining an MRI with contrast for more detail and definition, her records had to contain a report for the MRI with contrast, regardless of whether or not the findings were different from those for the MRI without contrast. This also is mandated by the Missouri regulations pertaining to patient records. Such a diagnostic report could have made a crucial difference in the outcome of this case, which will turn upon the jury's understanding of Chelsea's old injury and how that relates to the surgery performed on July 20, 2011. Incredibly, the report of the MRI without contrast is not the only missing radiology report in Chelsea's records. Within Flannery's Operative Report she mentions reviewing a CT scan in preparation for Chelsea's surgery, **(Ex. 3, CG Bates #0028)**, but neither the CT scan or the report has ever been produced in either version of Chelsea's records.

40.  Because it is now known that Defendants significantly de-constructed Chelsea's records after her death, it must be assumed that a radiologist issued a report for the MRI with contrast that was removed from the chart after Chelsea's death. The appearance of "Lab Results" below the report for the MRI without contrast that is contained within the Cardinal Glennon records, but not the earlier "Hall" records, suggests a link between the mysteriously deleted Lab Result scan, but more importantly, highlights that the extensive discrepancies between these records and the many material alterations and missing

records require drastic measures by the Court in response to the inequitable advantage Defendants have obtained through wilful violations of statutory and regulatory protections afforded to patients such as Chelsea Weekley.

WHEREFORE, Plaintiff, Sandra Hall, Special Administrator of the Estate of Chelsea Weekley, respectfully prays that the Court enter an Order as follows:

A.     Entering a default Judgment in favor of Plaintiff and against the Defendants, SSM Cardinal Glennon Children's Hospital, Dr. Ann Marie Flannery and Dr. Raghuram Sampath on the issues of liability;

B.     In the alternative, in whole or in part:

    i.     Barring Defendants from suggesting, or presenting any evidence to prove that Chelsea died from any cause other than seizure;

    ii.     Barring Defendants from arguing, suggesting, or presenting any evidence to prove that a surgical breach did not occur during the surgery on July 20, 2011;

    iii.     Barring Defendants from arguing, suggesting, or presenting any evidence to prove that Defendants did not perform a craniotomy during the surgery on July 20, 2011;

    iv.     Barring Defendants from arguing, suggesting, or presenting any evidence to prove that Chelsea Weekley had not experienced seizures prior to the surgery of July 20, 2011;

    v.     Barring Defendants from arguing, suggesting, or presenting any evidence that Chelsea was not predisposed to seizure prior to the craniotomy performed on July 20, 2011;

    vi.     Barring Defendants from arguing, suggesting, or presenting any evidence that Chelsea should not have been prescribed prophylactic anti-seizure medication

19

prior to discharge from the hospital on July 21, 2011;

vii.     Barring Defendants from arguing, suggesting, or presenting any evidence that the

prescription of prophylactic anti-seizure medication for Chelsea prior to her

discharge would not have been standard of care;

viii.    Barring Defendants from referring to or in any manner using the MRI report

without contrast at trial;

ix.      Striking Defendants' affirmative defenses.

C.    Awarding Plaintiff her reasonable and necessary attorneys fees and costs incurred as a

result of Defendants' sanctionable conduct;

D.    For such other and further relief as the Court deems just and proper.

<br>

PLAINTIFF, SANDRA HALL
s/ Rhonda D. Fiss
Rhonda D. Fiss #6191043

**THE LAW OFFICE OF RHONDA D. FISS, P.C.**
23 Public Square, Suite 230
Belleville, Illinois 62220
Tel - 618.233.8590
Fax - 618.233.8713
jdd@fisslawoffice.com
***Attorney for Plaintiff, Sandra Hall***

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on September 15, 2014, I electronically filed the foregoing instrument with the Clerk of the U.S. District Court of the Southern District of Illinois using the CM/EMF system, which will send notification of such filings to all registered case participants.

s/ Rhonda D. Fiss
Rhonda D. Fiss #6191043

\

**THE LAW OFFICE OF RHONDA D. FISS, P.C.**
23 Public Square, Suite 230
Belleville, Illinois 62220
Tel - 618.233.8590
Fax - 618.233.8713
jdd@fisslawoffice.com
***Attorney for Plaintiff, Sandra Hall***